# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **DEBORAH M. PAFFORD,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:04cv00138 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| Commissioner of Social Security, | ) | By:   Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Deborah M. Pafford, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pafford filed her current application for DIB[1] on or about March 22, 2002, alleging disability as of March 15, 2001, based on diabetes, nerve damage in the legs, arthritis of the knees, lumbar deteriorating disease, two protruding discs, chronic back pain, migraine headaches, numbness of the hands and bilateral carpal tunnel syndrome. (Record, ("R."), 60-62, 72, 97.) Pafford's claim was denied both initially and on reconsideration. (R. at 45-47, 50, 52-54.) Pafford requested a hearing before an administrative law judge, ("ALJ"), (R. at 55.) The ALJ held a hearing on June 24, 2003, at which Pafford was represented by counsel. (R. at 299-314.)

By decision dated July 18, 2003, the ALJ denied Pafford's claim. (R. at 20-27.)

---

[1] Pafford filed previous applications for DIB and supplemental security income, ("SSI"), on March 28, 2001. (R. at 36.) These claims were denied initially and on reconsideration, and Pafford requested a hearing before an ALJ. (R. at 36.) The ALJ rendered an unfavorable decision on December 7, 2001. (R. at 36-40.) Thereafter, Pafford appealed this unfavorable decision to the district court. (R. at 36.) Thereafter, this court affirmed the ALJ's unfavorable decision on March 19, 2004. *See Pafford v. Barnhart*, No. 02-186, slip op. (W.D. Va. Mar. 19, 2004). This court's decision was thereafter affirmed by the Fourth Circuit Court of Appeals on February 16, 2005. *See Pafford v. Barnhart*, No. 04-1640, slip op. (4th Cir. Feb. 16, 2005). Thus, this court must consider the period from December 8, 2001, through July 18, 2003, for current disability purposes.

The ALJ found that Pafford met the disability insured requirements of the Act for disability purposes through the date of the decision. (R. at 26.) The ALJ further found that Pafford had not engaged in substantial gainful activity since her alleged onset of disability. (R. at 26.) The ALJ found that the medical evidence established that Pafford had severe impairments, namely degenerative disc disease and insulin-dependent diabetes, but he found that Pafford did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23, 26.) The ALJ further found that Pafford's allegations regarding her limitations were not totally credible. (R. at 26.) The ALJ concluded that Pafford retained the residual functional capacity to perform medium work.[2] (R. at 26.) Thus, the ALJ found that Pafford could perform her past relevant work as a convenience store clerk, a cashier and a restaurant worker. (R. at 26.) Therefore, the ALJ found that Pafford was not disabled as defined by the Act and was not eligible for benefits. (R. at 26-27.) *See* 20 C.F.R. § 404.1520(f) (2005).

After the ALJ issued his decision, Pafford pursued her administrative appeals, (R. at 15-16), but the Appeals Council initially denied her request for review. (R. at 10-12.) On November 23, 2004, the Appeals Council set aside this decision in order to consider additional information, but thereafter again denied Pafford's request for review. (R. at 5-9.) Pafford then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on Pafford's motion for

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time and occasionally lifting or carrying items weighing up to 25 pounds. If someone can perform medium work, she also can perform sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2005).

summary judgment filed May 10, 2005, and the Commissioner's motion for summary judgment filed July 12, 2005.

## *II. Facts and Analysis*

Pafford was born in 1970, (R. at 60, 302), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education and past relevant work experience as a convenience store clerk, a cashier and a restaurant worker. (R. at 78, 81, 303.)

At her hearing, Pafford testified that her back and bilateral leg, wrist and hand pain were her most serious problems. (R. at 303.) She stated that she had nerve damage in her legs from diabetes, the left being worse than the right. (R. at 303, 308.) Pafford testified that she had been insulin-dependent since she was 16 years old. (R. at 303-04.) She stated that her blood sugar level ran as high as 400 and as low as 34. (R. at 308-09.) Pafford stated that she became disoriented, confused and forgetful when her blood sugar level dropped. (R. at 309.) She further testified that she had experienced neuropathies in her legs, causing her to sometimes walk with a limp. (R. at 304.) Pafford stated that she was 5'8 ½" tall and weighed 252 pounds. (R. at 305.) She further stated that she had been advised to lose weight because of her diabetes, but could not do so because she could not exercise. (R. at 305.) Pafford testified that she had two protruding discs in her back which caused lower back pain that radiated into both legs. (R. at 305-06.) She stated that she had been advised that surgery was not an option due to her diabetes. (R. at 305-06.) Pafford also testified that she experienced anxiety and depression, but was not seeing a mental health professional. (R. at 306.)

-4-

Pafford testified that she could not sit for long periods of time and had difficulty lifting objects. (R. at 306.) She stated that standing for 10 minutes resulted in pain and staggering. (R. at 308.) She stated that walking fatigued her, caused leg pain and caused her left leg to "drag." (R. at 308.) She further stated that she lacked balance, causing her to stagger. (R. at 308.) Thus, Pafford testified that someone had to help her shower so she would not fall. (R. at 308.) Nonetheless, she stated that she was able to perform light housework and that she sometimes drove. (R. at 306-07.) Pafford stated that she watched television "once in a while." (R. at 307.)

Vocational expert Robert Spangler also testified at Pafford's hearing. (R. at 309-13.) He classified Pafford's past work as a restaurant worker as light[3] and unskilled, a cashier as between light and medium and unskilled and a convenience store clerk as light and unskilled. (R. at 309-10.) Spangler was asked to consider a hypothetical individual of Pafford's height, weight, education and work history, who had a residual functional capacity to perform medium work, diminished by mild to moderate restrictions on her work-related activities resulting from an emotional disorder. (R. at 310.) Spangler testified that such an individual could perform the jobs of a stock clerk, a private household cleaner, a kitchen worker, a maid, a janitor, a farm worker, an assembler and a hand packer, all at the medium and light levels of exertion and all existing in significant numbers in the national economy. (R. at 310-11.) Spangler testified that if the individual's emotional disorder placed greater than moderate restrictions on her work-related abilities, then no jobs would be available. (R. at 311.) Next, Spangler stated that an individual who could not tolerate an eight-

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

hour workday, as Pafford testified, could not perform any jobs. (R. at 311.) Spangler was asked to consider the assessments completed by Dr. Paulsen. (R. at 311-12.) He testified that an individual with such limitations could not work. (R. at 312.) Likewise, Spangler testified that an individual with the limitations set forth in Dr. Walker's assessment would be unable to work. (R. at 312.) Finally, Spangler testified that an individual with the limitations set forth in Dr. Inocalla's assessment could not perform any work. (R. at 206-07, 312-13.)

In rendering his decision, the ALJ reviewed records from Dr. James E. Patterson, M.D.; Dr. J. Travis Burt, M.D., a neurosurgeon; Dr. Elsa P. Paulsen, M.D.; Smyth County Community Hospital; Dr. S.D. Vernon, M.D.; Dr. M.V. Inocalla, M.D.; Dr. Charlene M. Truhlik, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Frank M. Johnson, M.D., a state agency physician; Howard Leizer, Ph.D., a state agency psychologist; Hugh Tenison, Ph.D., a state agency psychologist; Dr. R.W. Walker, M.D.; Dr. John W. Whiteley, M.D.; and Mountain Empire Neurological Associates. Pafford's attorney also submitted medical records from Dr. Douglas P. Williams, M.D., and Dr. Walker to the Appeals Council.[4]

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe

---

[4]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 10-12), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-6-

impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

In her brief, Pafford argues that the ALJ rejected the opinion of Dr. Inocalla, thereby improperly substituting his opinion for that of a qualified psychologist or psychiatrist in finding that she had no severe mental impairment. (Plaintiff's Brief In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-10.) She further argues that the ALJ erred by finding that she retained the functional capacity for medium work. (Plaintiff's Brief at 10-11.) Finally, Pafford argues that the ALJ erred by failing to accord proper weight to the opinions of Dr. Paulsen and Dr. Walker, her treating endocrinologist and physician, respectively. (Plaintiff's Brief at 11-16.)

For the following reasons, I find that the ALJ did not improperly substitute his opinion for that of a qualified psychologist or psychiatrist in finding that Pafford had no severe mental impairment. First, contrary to Pafford's argument, Dr. Inocalla is not the only mental health source contained in the record. Instead, the opinions of the state agency psychologists are contained in the record. Thus, the ALJ's rejection of Dr. Inocalla's opinion, in and of itself, does not necessitate a finding that he

substituted his opinion for that of a qualified professional. Moreover, I find that substantial evidence supports both the rejection of Dr. Inocalla's opinion and the acceptance of the opinions of the state agency psychologists. In his opinion, the ALJ stated that he was rejecting Dr. Inocalla's[5] opinion because Pafford saw her on only one occasion and that Dr. Inocalla's report contained no objective mental status evaluation. I find that such is supported by substantial evidence. For instance, Dr. Inocalla administered no tests like the Wechsler Adult Intelligence Scale, ("WAIS"), the Wide Range Achievement Test, ("WRAT"), or the Minnesota Multiphasic Personality Inventory, ("MMPI"). In fact, it appears that Dr. Inocalla relied solely on Pafford's subjective allegations in reaching her diagnosis. Dr. Inocalla reported that Pafford appeared depressed and she stated that she was unable to sleep. (R. at 206.) She stated that she had no energy, had difficulty remembering and concentrating, became easily irritated and could not be in crowds. (R. at 206-07.) Pafford denied suicidal ideation. (R. at 207.) She reported no then-current treatment for depression. (R. at 207.) She was diagnosed with provisional rule out major depressive disorder, recurrent, moderate with psychotic features and a Global Assessment of Functioning, ("GAF"), score of 45.[6] (R. at 206.)

Furthermore, Dr. Inocalla's findings are contradicted by state agency

---

[5]The ALJ actually referred to Dr. Inocalla as Dr. Abeleda. Apparently, the confusion arose because the evaluation contained the typewritten name of Dr. Abeleda, but Dr. Inocalla crossed out this name, printed her own and signed it. (R. at 206-07.)

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41 to 50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning. ..." DSM-IV at 32.

psychologists Leizer and Tenison, who found that Pafford suffered from a nonsevere affective disorder, namely depression. (R. at 224-38.) They found that Pafford was only mildly restricted in her activities of daily living, in her ability to maintain social functioning and in her ability to maintain concentration, persistence or pace. (R. at 234.) They found that Pafford had experienced no episodes of decompensation. (R. at 234.) I note that the state agency psychologists' assessment is supported by Pafford's activities of daily living, including getting her children off to school, preparing meals five to six times weekly, helping her children with homework, driving herself to medical appointments and to the grocery store and retail stores, performing household chores every two weeks, doing laundry weekly, reading the newspaper twice a week, visiting friends and relatives monthly and talking on the telephone. (R. at 89-95.) She further noted that she needed no help paying bills, dealing with bank accounts or insurance claims or taking care of her personal needs, such as grooming, bathing and dressing. (R. at 91, 93.)

I further find that the opinion of the state agency physicians is supported by Pafford's lack of mental health treatment. It appears that she first sought help from a mental health professional in June 2002, when she saw Dr. Inocalla. (R. at 206-07.) However, as noted by the ALJ, she saw Dr. Inocalla on only that one occasion. The next evidence of Pafford's mental health was on November 5, 2002, when the state agency psychologists completed a PRTF. (R. at 224-38.) On February 5, 2003, Dr. Walker diagnosed Pafford with anxiety neurosis, apparently based on Pafford's reports, and prescribed Xanax. (R. at 241.) There is no other mental health evidence contained in the record. Thus, Pafford sought mental health treatment on only one occasion and did not complain to her treating physicians of any mental difficulties,

with the exception of reporting a history of anxiety neurosis to Dr. Walker.

Finally, I note that even though the ALJ found that Pafford did not have a severe mental impairment, the hypothetical to the vocational expert, upon which the ALJ relied in determining whether Pafford could perform jobs existing in significant numbers in the national economy, incorporated mild to moderate restrictions on Pafford's work-related abilities based on a mental disorder. (R. at 310.) Thus, the ALJ gave Pafford the benefit of the doubt regarding her mental status.

For all of these reasons, I find that the ALJ did not improperly substitute his opinion for that of a trained mental health professional and that substantial evidence supports his finding that Pafford does not have a severe mental impairment.

Next, Pafford argues that the ALJ erred by failing to give controlling weight to the opinion of Dr. Elsa P. Paulsen, M.D., her treating endocrinologist. (Plaintiff's Brief at 11-13.) For the following reasons, I find that substantial evidence supports the ALJ's finding on this issue. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d)(2) (2005). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion

is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Dr. Paulsen began seeing Pafford on January 22, 2002. (R. at 192-93.) At that time, Pafford reported that Lortab and Darvocet helped the pain in her legs and hips. (R. at 192.) Pafford described numbness in her left arm and left foot, as well as carpal tunnel syndrome. (R. at 193.) She again saw Dr. Paulsen on March 22, 2002. (R. at 190.) Pafford related no concerns at that time. (R. at 190.) On April 12, 2002, Dr. Paulsen mailed Pafford a prescription for Lortab. (R. at 188.) On June 20, 2002, Dr. Paulsen completed a Physical Assessment Of Ability To Do Work-Related Activities. (R. at 208-10.) Dr. Paulsen concluded that Pafford could not lift or carry items due to degenerative changes at a very young age. (R. at 208.) She further found that Pafford could stand and/or walk for only minutes at a time. (R. at 208.) Dr. Paulsen found that Pafford could sit for a total of approximately 20 minutes during an eight-hour workday. (R. at 209.) She found that Pafford could never climb, stoop, kneel, balance, crouch or crawl. (R. at 209.) She further found that Pafford's abilities to reach, to handle, to feel, to push and/or pull and to see were affected by her impairment. (R. at 209.) Dr. Paulsen restricted Pafford from working around heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity. (R. at 210.) However, Dr. Paulsen noted that these restrictions affected Pafford's activities "[b]y history," and she noted no medical findings to support this assessment. (R. at 210.) Dr. Paulsen further noted that Pafford's "physical ability [was] extremely limited." (R. at 210.)

In August 2002, Dr. Paulsen completed a Medical Evaluation, concluding that

Pafford had neuropathy related to insulin-dependent diabetes, and she opined that this illness would last a lifetime. (R. at 186-87.) Dr. Paulsen indicated that Pafford's abilities to lift, to stoop, to climb, to bend, to stand, to walk and to reach were limited. (R. at 186.) She further found that Pafford could not place items weighing less than five pounds on shelves above her head. (R. at 186.) Dr. Paulsen indicated that Pafford was unable to participate in job searches, job skills training, job readiness training or employment. (R. at 187.) She further opined that Pafford's condition hindered her ability to care for her children. (R. at 187.) Dr. Paulsen further noted that although Pafford was complying with her treatment/medication, she would not be able to work at the end of such treatment period. (R. at 187.) Again, it appears that Dr. Paulsen's evaluation was not based on any objective testing.

Moreover, the objective testing contained in the record contradicts Dr. Paulsen's severe restrictions. For instance, an x-ray of the lumbar spine taken on March 13, 2001, showed possible narrowing of the L4-L5 disc compatible with increased degenerative changes. (R. at 172.) An MRI revealed posterior midline protrusion of the L4-5 disc and advanced degenerative changes of the L4-5 and L5-S1 discs. (R. at 172.) On April 2, 2001, a venous duplex showed no evidence of left lower extremity deep vein thrombosis, ("DVT"), or thrombosis of the left greater/lesser saphenous vein. (R. at 171.) There was no evidence of insufficiency of the left lower extremity veins. (R. at 171.) On August 1, 2001, an x-ray of Pafford's left knee was normal. (R. at 142, 163.) An x-ray of the lumbar spine taken on August 15, 2001, showed no definite spondylolysis or spondylolisthesis. (R. at 182.) A bone scan was negative. (R. at 183.) On August 21, 2001, Pafford saw Dr. Burt J. Travis Burt, M.D., who noted that electrical studies showed borderline

peripheral neuropathy without evidence of lumbar radiculopathy. (R. at 174.) A bone scan was normal and x-rays of the lumbar spine showed no evidence of instability, spondylolisthesis or subtle fracture. (R. at 174.) Although Pafford continued to complain of chronic back and left leg pain, Dr. Burt noted that an MRI showed no evidence of neurocompression or disc herniation. (R. at 174.) The following day, a lumbar myelogram showed no gross abnormality. (R. at 174, 179.) A CT scan revealed disc protrusion centrally at the L4-L5 level without obvious extrusion or nerve root compromise. (R. at 180-81.) On December 27, 2001, Pafford underwent a nuclear stress test under the supervision of Dr. S.D. Vernon, M.D. (R. at 164, 170.) The test yielded normal results. (R. at 164, 170.) An MRI of the cervical spine taken on March 1, 2002, showed no significant herniated nucleus pulposus or evidence of spinal stenosis. (R. at 166.) An MRI of the left knee showed a very small joint space effusion of undetermined significance, possibly physiologic. (R. at 167.) An MRI of the right knee also showed a very small joint space effusion and possible patella chondromalacia. (R. at 168.) On May 31, 2002, Dr. James E. Patterson, M.D., noted that although Pafford had lumbar disc disease, there was no radiological evidence of significant nerve pressure. (R. at 119.) On June 5, 2002, a lumbar MRI showed disc protrusion centrally at the L4-L5 level without extrusion. (R. at 203.) On September 4, 2002, an x-ray of the lumbar spine showed no destructive lesion or fracture. (R. at 165.) Dr. Douglas P. Williams, M.D., saw Pafford on August 12, 2003, at which time he performed nerve conduction studies. (R. at 265-71, 273-75.) He diagnosed moderate carpal tunnel syndrome bilaterally, worse on the right. (R. at 267, 275.) An venous ultrasound of the bilateral lower extremities taken on May 28, 2003, was normal. (R. at 292.)

Furthermore, physical examinations consistently yielded minimal findings. For instance, despite complaints of left foot numbness in March 2001, Dr. Patterson noted that Pafford's foot was normal and her pulses were strong. (R. at 156.) On March 9, 2001, Pafford exhibited no cervical lymphadenopathy, straight leg raising was positive on the left and there was no cyanosis or edema of the extremities. (R. at 155.) On March 16, 2001, Dr. Patterson noted that, despite degenerative changes of the lumbar spine, Pafford functioned "generally well." (R. at 154.) On April 2, 2001, Pafford again complained of left foot numbness, but an examination showed no heat or redness, but some tenderness of the left calf. (R. at 152.)

On May 22, 2001, Pafford saw Dr. J. Travis Burt, M.D., a neurosurgeon, with complaints of low back and left leg pain. (R. at 176-78.) A physical examination revealed marked limitation of range of motion of the lumbar spine. (R. at 177.) However, Pafford's motor strength was normal in the lower extremities. (R. at 177.) Deep tendon reflexes of the lower extremities were 2+ and a sensory examination showed some decreased sensation in the distal tuft of the left hallux. (R. at 177.) However, Dr. Burt was unable to appreciate any neuropathy or diabetic sensory changes in the lower extremities. (R. at 177.) Pafford's cranial nerves were grossly intact. (R. at 177.) Dr. Burt noted that a previous MRI showed no evidence of neurocompression or disc herniation. (R. at 177.)

On September 7, 2001, a physical examination again showed no cervical lymphadenopathy, and Pafford exhibited no cyanosis or edema of the extremities. (R. at 138.) On December 11, 2001, Pafford complained of bilateral leg pain, and she exhibited tenderness along the low back. (R. at 135.) On February 13, 2002, Pafford

exhibited no cervical lymphadenopathy, and her extremities showed no cyanosis or edema. (R. at 131.) On February 19, 2002, she exhibited back tenderness. (R. at 130.) On June 5, 2002, Pafford exhibited marked tenderness to palpation of the lumbar spine, especially on the left. (R. at 203.) Nonetheless, her motor strength was normal bilaterally with no weakness, and she was sensorily intact. (R. at 203.) On July 16, 2002, Pafford exhibited no edema of the extremities. (R. at 115.) On September 4, 2002, Pafford exhibited no cervical lymphadenopathy and no cyanosis or edema of the extremities. (R. at 112.) She exhibited some tenderness and muscle spasm. (R. at 112.) On January 3, 2003, Dr. R.W. Walker, M.D., noted some slight decreased sensation in the lower extremities. (R. at 245.)

Pafford saw Dr. John W. Whiteley, M.D., on February 11, 2003, for complaints of low back and leg pain. (R. at 256-58.) At that time, her gait was antalgic, and she exhibited multiple trigger points. (R. at 257.) She showed decreased sensation in the L5-S1 distribution on the left. (R. at 257.) Strength was normal in both upper and lower extremities. (R. at 257.) On March 11, 2003, Dr. Whiteley reported tender trigger points in the bilateral occipital area. (R. at 253.) The following day, Dr. Douglas P. Williams, M.D., summarized his treatment of Pafford for migraine headaches. (R. at 263, 272.) A physical examination showed intact cranial nerves, symmetric muscle strength bilaterally, 2/4 reflexes and a normal gait. (R. at 263, 272.) On June 2, 2003, Pafford showed mild trigger points in both posterior and superior iliac spines, the mid thoracic area, the rhomboids and the trapezius. (R. at 290.) On June 10, 2003, Dr. Walker noted soreness to touch in the lower extremities, but Pafford's peripheral pulses were good. (R. at 289.) On July 21, 2003, Dr. Whiteley noted that Pafford had difficulty sitting and exhibited an antalgic gait. (R.

-16-

Case 1:04-cv-00138-PMS   Document 18   Filed 08/30/05   Page 16 of 20   Pageid#: 88

at 286.) On July 29, 2003, Pafford had a negative Tinel's sign despite subjective complaints of numbness and tingling in the first and second digits of both hands, the left being greater than the right. (R. at 278.) However, Dr. Walker noted no thenar muscle atrophy. (R. at 278.)

The record reveals that Pafford was treated conservatively with medications and several trigger point injections that helped to relieve her pain. Pafford consistently requested refills on Lortab and Xanax to help control her pain. On January 22, 2002, Pafford reported that Lortab and Darvocet helped the pain in her legs and hips. (R. at 192.) On June 21, 2002, after having undergone a steroid block on June 10, 2002, Pafford reported that she obtained relief for approximately one week. (R. at 117-19.) On February 11, 2003, Pafford described her pain as stable and controlled with Lortab and Xanax. (R. at 256.) The following month, Dr. Whiteley noted that Pamelor and Lexapro helped Pafford move and Lortab was controlling her pain. (R. at 253.) On June 2, 2003, Pafford noted that she was doing better since she began taking Methadone. (R. at 290.) It is well-settled that "[i]f a symptom can be reasonably controlled with medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

I further note that Pafford's activities of daily living, as outlined above, contradict Dr. Paulsen's harsh restrictions. Finally, I find that Dr. Paulsen's findings are contradicted by the findings of the state agency physicians, which, in turn, are supported by all of the above-mentioned medical evidence. For instance, on October 31, 2002, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment, finding that Pafford could

perform medium work. (R. at 216-23.) Dr. Surrusco found that Pafford could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 219.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 219-21.) This assessment was affirmed by Dr. Frank M. Johnson, M.D., another state agency physician, on February 12, 2003. (R. at 223.)

For these reasons, I find that substantial evidence supports the ALJ's rejection of Dr. Paulsen's findings regarding Pafford's work-related limitations.

Pafford next argues that the ALJ erred by completely ignoring the opinion of her treating physician, Dr. Walker. (Plaintiff's Brief at 13-16.) I first note that, contrary to Pafford's assertion, the ALJ did not completely ignore Dr. Walker's findings. In fact, the ALJ stated as follows in his decision: "[Dr. Walker's] records do not reflect any objective medical findings on examination. ..." (R. at 23.) Thus, it appears that the ALJ specifically considered and rejected Dr. Walker's findings. For the following reasons, I find that substantial evidence supports such a rejection.

In a Physical Assessment Of Ability To Do Work-Related Activities dated October 17, 2003, Dr. Walker found that Pafford could lift/carry items weighing up to only three pounds occasionally and up to only one pound frequently. (R. at 297-98.) He further found that Pafford could stand and/or walk for a total of four hours in an eight-hour workday, but could do so for less than four hours without interruption. (R. at 297.) Dr. Walker concluded that she could sit for a total of four hours in an eight-hour workday, but for only one hour without interruption. (R. at 297.) He found that Pafford could never climb or crawl, but could occasionally stoop,

kneel, balance and crouch. (R. at 298.) Dr. Walker further found that Pafford's abilities to reach, to handle objects, to feel and to push and/or pull were affected by her impairment. (R. at 298.) Finally, he concluded that Pafford should not work around vibration. (R. at 298.) Dr. Walker noted that he was basing his findings on Pafford's carpal tunnel syndrome and chronic myofascial pain syndrome. (R. at 297-98.) I note that despite imposing such harsh restrictions in October 2003, Dr. Walker had been treating Pafford conservatively since January 2002 and had never placed any restrictions on her work-related abilities up until the October 2003 assessment. Thus, I find that Dr. Walker's assessment is inconsistent with his own treatment notes.

For these reasons, I find that the ALJ considered Dr. Walker's assessment and that substantial evidence supports the ALJ's rejection thereof.

Lastly, Pafford argues that the ALJ erred in his finding that she retained the functional capacity to perform medium work. However, for all of the reasons already discussed, I find that substantial evidence exists to support such a finding.

### *III. Conclusion*

For the foregoing reasons, Pafford's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision to deny benefits will be affirmed.

An appropriate order will be entered.

DATED: This 30th day of August, 2005.

-19-

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE